UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NICHOLAS CAGGIANIELLO, NEIL HOWARD and THOMAS FALCO, on behalf of themselves and all other similarly situated employees of FSG, Inc.<br><br>Plaintiffs,<br><br>vs.<br><br>FSG, INC., and in their individual and official capacities DAVID C. HURLEY, HUGH F. REGAN, THOMAS H. MILLER and THOMAS L. CONNELLY<br><br>Defendants. | CIVIL ACTION NO. 3:03CV1011(AWT)<br><br>November 18, 2005 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SECOND RENEWED MOTION TO DISMISS**

**I.      PRELIMINARY STATEMENT**

Plaintiffs Nicholas Caggianiello, Neil Howard and Thomas Falco, on behalf of themselves and all other similarly situated employees of FSG, Inc., by their attorney, submit this memorandum of law in support of their objection to defendants second renewed motion to dismiss the above-entitled action pursuant to Federal Rules of Civil Procedure 12(b)(1). This Court denied Defendants' original motion to dismiss on October 9, 2004 and Renewed Motion to Dismiss on March 16, 2005. The Court ordered the parties to conduct discovery on the limited issue of subject matter jurisdiction.

Plaintiffs have stated claims for relief under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (FLSA) for unpaid overtime wages. The defendants have moved to dismiss the plaintiffs' claims on the basis that the defendant FSG, Inc. is a "Common Air

Carrier subject to Title II of the Railway Labor Act" and therefore the employee plaintiffs are exempted from the provisions of the FLSA pursuant to 29 U.S.C. §213(b)(3).

## II. STATEMENT OF FACTS

The basic facts of this case are largely undisputed. During the period at issue, 2000 through 2003, Plaintiffs, Nicholas Caggianiello, Neil Howard and Thomas Falco, were employed by FSG PrivatAir, Inc. (hereinafter "FSG"). During that time, Plaintiffs routinely worked in excess of forty hours per week but failed to receive overtime compensation as mandated by 29 U.S.C. § 207(a) of the Fair Labor Standards Act (hereinafter FLSA). While subjecting itself to the provisions of the FLSA and Connecticut's equivalent statutes throughout the period of plaintiffs' employment, FSG originally exempted these employees from the overtime provisions on the basis that they were professionals under C.G.S. § 31-60. *See* Exhibits A and B, Caggianeillo and Falco Affidavits; Exhibit C, March 18, 2003 letter from FSG counsel.

Subsequent to the filing of this action, FSG now asserts that it is exempt from these state and federal wage laws on the basis that it is a "common carrier by air subject to the provisions of Title II of the Railway Labor Act."

FSG is in the business of managing aircraft on behalf of private aircraft owners, providing clients with "turnkey" aircraft management services which includes airplane maintenance, storage, ground handling, piloting, brokerage, sales, compliance and private chartering. *See* Exhibits A and B.

Aircraft managed by FSG may be chartered by third parties, but only with the express permission of the aircraft owner. *See* Exhibit B, Deposition of Thomas

Fitzsimmons at 37. In most instances, FSG must get permission from the owner of the aircraft, providing details of the proposed use before the plane can be flown. *See* Exhibit E, p. 101. Furthermore, the individuals who charter their clients' planes are hand-picked from a list of potential customers mostly formed by a network of word-of mouth relationships fostered by FSG's relationships with aircraft brokers, dealers and owners. *See* Exhibit E, p. 113-117. According to its own published accounts, FSG is very selective in choosing who they will allow to fly their clients' aircraft, performing background checks and invoking the right of refusal to anyone on undefined, non-standard and wholly subjective basis. *See,* Exhibit E, Deposition of Hugh Regan at 107.

FSG's marketing budget averaged less than $100,000 dollars per year for the time at issue. *See* Deposition of Thomas Fitzsimmons at 38, 40-44. Significantly, the vast majority of this money was expended on client development and maintenance, not, as FSG would lead the court to believe, on holding itself out to the general public as ready to carry for *anyone* who requests its services.[1] According to witnesses designated by FSG as being the most knowledgeable of the company's marketing efforts, there is no way to distinguish between those efforts directed at gaining more aircraft owners to increase their fleet of managed aircraft and those directed at the exclusive pool of potential charter clients. *See* Exhibit Id.

---

[1] For example, in the Defendant's disclosed spreadsheet on advertising and marketing, their records reveal that for the year 2000, of their $80,677.71 marketing budget, they spend almost $23,000.00 on non-advertising promotional items and client gifts. For the year 2001, of their $44,084.24 marketing budget, they spent $23,728.00 on non-advertising promotional items and client gifts. For the year 2002, of their $127,233.56 marketing budget, they spent $67,140.90 on promotional items and client gifts. Finally, in 2003 (and importantly, the year in which this action was filed) their marketing budget revealed a dramatic increase in "advertising." *See,* Exhibit G collectively the financial records of marketing expenses. Importantly, the amounts allocated to advertisements in their financial records was not segregated out to apply solely to the operations under which the Plaintiffs were employed. Instead, the budget was for all entities and all sources of advertising – effectively skewing the appearance of a higher advertising spend for the actual entities with which the Plaintiffs were employed. *See,* Deposition of Thomas Fitzsimons at 38, 40-44.

Along these same lines, FSG's then CFO Mr. Hugh Regan, testified that the advertisements the Defendants provided in discovery were based out of the "Geneva Operation." *See,* Exhibit E, Deposition of Hugh Regan at 83-86. Along these same lines, Mr. Regan also testified that the Defendants did not hold themselves out, or advertise – nor were they permitted to do so – in any U.S. market regarding international operations. *See, Id.* At 22-23. As a result, Mr. Regan's testimony establishes that of the universe of ads disclosed by the Defendants, none were directed to the United States market – in effect establishing that the Defendants did not, as they now assert, hold themselves out to the general public in the United States as being willing to transport for hire, indiscriminately.

Finally, it is instructive to note that Mr. Regan testified that in general, charter flights originated roughly 35% from air charter brokers and the remaining 65% from the existing client base and third parties who were obtained by word-of-mouth or pointed solicitations and marketing efforts. *See* Regan Deposition at 101-104

Furthermore, the Defendant's sales people are dedicated to maintaining and securing aircraft for FSG's management services, including the possibility of chartering those aircraft on behalf of the owners, but this is not their primary sales role. According to Mr. Regan, a substantial portion of Charter Flights came from the marketing efforts of unaffiliated air charter brokers with the balance coming from an established client list. *See* Id. At 113-117.

### III.    STANDARD FOR MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Under Rule 12(b)(1), a case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional authority to adjudicate it.

Makarova v. United States, 201 F.3d 110, 113 (2d Cir.2000); Fed.R.Civ.P. 12(b)(1). "In considering motions to dismiss for want of subject matter jurisdiction, the Court must accept as true all material factual allegations in the Complaint and refrain from drawing inferences in favor of the party contesting jurisdiction." Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir.1992).

In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court is not limited to the face of the complaint and may consider evidence outside the pleadings. See Phifer v. City of New York, 289 F .3d 49, 55 (2d Cir.2002); Robinson v. Gov't of Malaysia, 269 F.3d 133, 140-41 (2d Cir.2001); Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir.1986). Furthermore, the burden rests on the party invoking the court's authority to establish that the court possesses subject matter jurisdiction over the action. See Shenandoah v. Halbritter, 366 F.3d 89, 91 (2d Cir.2004). Additionally, that party must prove their burden of persuasion by a preponderance of the evidence. See Luckett v. Bure, 290 F.3d 493, 497 (2d Cir.2002).

IV. ARGUMENT

    A. **Statutory Framework Of The FLSA**

The FLSA establishes the general rule that all employees are entitled to receive overtime compensation for hours worked in excess of forty (40) hours during a seven-day workweek. 29 USC §207(a)(1); Vela v. City of Houston, 276 F.3d 659, 666 (5th Cir. 2001). Under this general rule, every employee is entitled to overtime compensation unless his employer proves that one of the FLSA's exemptions applies to him. Vela, supra. The FLSA represents a major enactment by Congress of social and economic

5

policy.  Foremost Dairies, Inc. v. Wirtz, 381 F.2d 653, 655 (5th Cir. 1967).  It is designed to provide a minimum standard of living necessary for the health, efficiency and general well-being of workers, as well as to prescribe certain minimum standards for working conditions.  Brennen v. Wilson Building, Inc., 478 F.2d 1090, 1094 (5th Cir. 1973).  The maximum hour and overtime provisions of §207 are remedial and humanitarian in purpose, and must not be interpreted or applied in a narrow, grudging manner.  Tennessee Coal, Iron & R. Co. v. Muscodo Local No. 123, 321 U.S. 590, 597, 64 S.Ct. 698, 703 (1944).  The Supreme Court long ago recognized that breadth of coverage was vital to the FLSA's mission.  Powell v. U.S. Cartridge Co., 339 U.S. 497, 516, 70 S.Ct. 755, 766 (1950).   Consistent with the foregoing, courts have repeatedly held that the remedial provisions of the FLSA are to be liberally construed to effectuate Congress' remedial intent.  <u>Donovan v. Sabine Irrigation Co., Inc</u>., 695 F.2d 190, 194 (5th Cir. 1983).  The reason FLSA exemptions have been drawn narrowly is to minimize the number of employees who lose the Act's protections.  <u>Dole v. Petroleum Treaters, Inc</u>., 876 F.2d 518, 523 (5th Cir. 1989); <u>Arnold v. Ben Kanowsky, Inc</u>., 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960).  To effectuate the remedial and humanitarian purposes of the FLSA, the courts have liberally construed the Act "to apply to the furthest reaches consistent with congressional direction."  Mitchell v. Lubin McGaughy & Associates, 358 U.S. 207, 211, 79 S.Ct. 260, 263, 3 L.Ed.2d 243 (1959).

FSG relies on 29 USC §213(b)(3), which exempts from the FLSA's overtime requirements "any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act."  Title II of the Railway Labor Act, by its own terms, applies only to "every common carrier by air…." 45 USC §181.  But contrary to the position taken by

6

FSG, operation under a common carrier certificate does not automatically designate them to be a "common carrier by air..." as that phrase is employed in 45 USC §181 or referenced in 29 USC §213(b)(3) of the FLSA

The fundamental purpose of the Railroad Labor Act is to promote stability in labor management relations by providing a comprehensive framework for resolving labor disputes in the predominately vital transportation section of this nation's economy. Upon its adoption in 1926, it continues to serve as a comprehensive dispute resolution scheme as it fosters a special working accommodation between labor and management in the transportation industry. 45 U.S.C. § 184. Importantly, the RLA was designed to prevent interruption in transportation commerce. The purpose of the RLA is to bring about stable relationships between labor and management in the national transportation industry in order to "keep transportation moving." (*Thibodeaux v. Executive Jet Intern., Inc.* (5th Cir. 2003) 328 F.3d 742, 754.) The RLA was not designed, as defendants propose here, to allow certain employers whose company caters to the wealthy to trample over the basic wage and hour provisions of the FLSA without adherence to its own mandates.

Section 152 of the RLA imposes several duties upon common carriers under its jurisdiction, including the maintenance of agreements concerning rates of pay, rules and working conditions. The RLA also imposes a duty that all disputes between a carrier and its employees shall be considered and, if possible, decided in conference between duly authorized labor and management representatives. It further requires air carriers *subject* to its provisions to designate representatives for this purpose and that various notices concerning employee rights under the RLA be prominently displayed in the workplace. Because FSG has never complied with these RLA mandates, it should not be allowed to

claim that it falls under its purview to merely escape the obligations under the Fair Labor Standards Act while flaunting the protections guaranteed by the RLA.

B.   **JURISDICTION**

### 1) The Question Presented is Novel to the Second Circuit.

The question of whether operations like the defendant's foreign owned aircraft management company is exempt from the provisions of the FLSA is novel to the Second Circuit.  This court is not bound by decisions rendered in other Circuit Courts, as defendants have forcefully argued. Decisions of one circuit court of appeals are not binding upon another circuit.  Newsweek, Inc. v. U.S. Postal Service, 663 F.2d 1186, C.A.2, 1981.  More specifically, cases from other circuits do not bind the Court of Appeals of the Second Circuit.  Securities and Exchange Commission v. Shapiro, 494 F.2d 1301, C.A.2 (N.Y.), 1974.  "Until the Supreme Court speaks, federal circuit courts are under duties to arrive at their own determinations of merits of federal questions presented to them; if the federal court simply accepts the interpretation of another circuit without independently addressing the merits, it is not doing its job." Menowitz v. Brown, 991 F.2d 36, 40 C.A.2.N.Y., 1993.

Subjecting FSG's services to the provisions of the FLSA, rendered on behalf of their exclusive, hand-picked clients (Royalty, musicians, movie stars, and CEO's) in the operation of their privately owned aircraft, including the occasioned charter flight of that aircraft on behalf of the owner, will not threaten the Country's transportation system just as subjecting them to the RLA will not enhance the stable relationships between labor and management in the national transportation industry.  In making that decision, this

Court is not bound by the decisions of the other circuits. It should independently evaluate the merits of the plaintiffs' argument, including the general issues of material facts that are in dispute. Menowitz, 991 F.2d at 40.

### 2) Genuine Issues of Material Fact Exist Which Requires a Plenary Trial or Evidentiary Hearing Regarding this Jurisdictional Issue.

Applying the well-established standards of review set forth above compels denial of the Second Renewed Motion to Dismiss for lack of subject matter jurisdiction. The defendants make bald assertions, argue legal conclusions and submit extrinsic facts[2] in an effort to refute allegations that neither the defendant employer nor plaintiff employees are subject to the provisions of Title II of the Railway Labor Act.

Under Fed. R. Civ. P. 12(b)(1), the court is constrained by the kinds of extrinsic evidence it may consider, as it can only consider extrinsic evidence provided it does not involve the merits of the dispute. The genuine issues of material fact present here should be fully and fairly presented to the ultimate fact-finder and not decided on this motion to dismiss. See Gonzalez v. United States, 284 F.3d 281, 287 (1st Cir.2002)(stating that the facts relevant to the determination of subject matter jurisdiction do not go directly to the merits of the plaintiff's claim and therefore, a 12(b)(1) motion should not be characterized as a motion for summary judgment on this ground.) The Plaintiffs submit that the jurisdictional issue of whether the parties are subject to Title II of the RLA and therefore exempt from the FLSA is inseparable from the merits of the case and they should therefore be tried together with all such genuine issues of material fact. At the very least,

---

[2] It should be noted that since the initiation of this litigation, the defendant FSGFSG has made many changes to their business operation, including changes to their website. See Defendants' Exhibit B. Such changes are irrelevant to the question of whether it held itself out the public during the time in question.

a jurisdictional evidentiary hearing or plenary trial should be allowed to find the facts necessary to resolve this threshold issue.

      **C.**      **FSG Is Not A "Common Carrier By Air" Within the Meaning of 29 U.S.C. §213(b)(3)**

The terms "carrier by air" and "common carrier by air" are terms not defined in either the FLSA or RLA. In assessing whether a carrier is a "common carrier by air" under the FLSA regarding wage issues, the Fifth and Eleventh Circuits have followed the test established in Woolsey v. National Transportation Safety Board, 993 F.2d 516 (5th Cir. 1993). In assessing the status of a carrier, Woolsey found crucial "whether the carrier had held itself out to the public or to a definable segment of the public as being willing to transport for hire, indiscriminately." Id. at 521. The court placed great emphasis on the fact that the test was "an objective one, relying upon what the carrier actually does rather than upon the label which the carrier attaches to its activity or the purpose which motivates it." Id. at 523; citing Las Vegas Hacienda, 298 F.2d at 434. Woolsey construed "common carrier by air" broadly because, as the court noted, the case involved the field of aviation safety regulation. Id. at 526. While a broad construction of "common carrier by air" is appropriate in contexts relating to aviation safety, such a construction is not appropriate in the context of an exemption from the FLSA's overtime provisions.

     A common carrier is usually defined as:

> One who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally. *The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant.*

10

Mickler v. Nimishiller and Tuscarawas Railway Co., 13 F.3d 184, 186 (6th Cir. 1993); (emphasis added). See also: Iverson v. South Minnesota Beet Sugar Co-op, 62 F.3d 259, 262-263 (8th Cir. 1995); Woolsey v. National Transp. Safety Bd., 993 F.2d 516, 523 (5th Cir. 1993); Kieronski v. Wyardotte Terminal Railroad, 806 F.2d 107, 108 (6th Cir. 1986); Mahfoud v. Continental Grain Co., 718 F.2d 779, 781-2 (5th Cir. 1983); Ako v. Erie Mining Co., 446 F.2d 539, 540 (8th Cir. 1972); Lone Star Steel Company v. McGee, 380 F.2d 640, 647 (5th Cir. 1967); Haley v. United Airlines, 728 F.Supp. 374, 376 (D. Md. 1989). Because a common carrier is considered to be to some extent a public servant, it usually has heightened safety obligations to its passengers. Thus, common carriers are typically held to owe their passengers a duty of utmost care and the vigilance of a very cautious person. USAir, Inc. v. U.S. Dept. of Navy, 14 F.3d 1410, 1413 (9th Cir. 1994). They are responsible for any, even the slightest, negligence and are required to do all that human care, vigilance, and foresight reasonably can do under all the circumstances. Andrews v. United Airline, Inc., 24 F.3d 39, 40 (9th Cir. 1994); Krys v. Lufthanse German Airlines, 119 F.3d 1515, 1527 (11th Cir. 1997).

Holding out is not a formal matter, but consists of "conduct naturally inducing a belief in the minds of the public." Jackson v. Stancil 253 N.C. 291, 302; 116 S.E.2d 817(1960). For an entity to hold itself out, "the essential thing is that there shall be a public offering of the service, or, in other words, a communication of the fact that service is available to those who may wish to use it." Id.  "[T]he dominant factor in fixing common carrier status at common law is the presence of a 'holding out' to transport the property or person of any member of the public who might choose to employ the

11

proffered service." <u>Las Vegas Hacienda, Inc. v. Civil Aeronautics Board</u>, 298 F.2d 430, 434 (9th Cir.1962).

Indiscriminately means "making no careful distinctions or choices or haphazardly random selections." Encarta World English Dictionary, 1998-2004 Microsoft Corporation. As the plaintiffs state in their complaint, FSG is an air carrier "providing aviation services including private travel charter services, corporate shuttle services, aircraft sales and management and ground services." <u>See</u> Complaint ¶ 21. These facts do not mean that the defendants' charter and corporate shuttle services were indiscriminately available to the public; it merely means that they were available. The defendants FSG turned away clients based on background checks and their request destination. <u>See</u> Defendants' Exhibit C, article from *Connecticut Post*. Certainly, if an aircraft management company can turn away its customers based on a background check and request destination, it is not being indiscriminate to the general public. Even FSG's former Chief Operating Officer conceded they were very discriminating as to who they would seek to offer Charters to. Their former COO also conceded that many aircraft owners required their permission to fly the plane on an individual basis. *See* Exhibit E, Regan deposition pp. 107.

The defendant FSG was an aircraft management company at the time the plaintiffs were employed there. See Plaintiffs' Exhibit A, affidavit of Nicholas Caggianiello; Plaintiffs' Exhibit B, affidavit of Thomas Falco. FSG, Inc. provided "turn key" aircraft management services to aircraft owners including airplane maintenance, storage, ground handling, piloting, brokerage, sales, compliance and chartering. <u>Id.</u>

Moreover, none of the planes at its Stratford facility were owned by the defendant FSG or its related entities. Id. No tickets were ever issued for flights managed by defendant FSG nor were passengers or their luggage subjected to any security checkpoint. Id. Employees of FSG were not required to wear uniforms. Id.

The defendants rely on the case of Thibodeaux v. Executive Jet International, Inc. in urging this court to find plaintiffs are employees of an air carrier subject to Title II of the RLA. Thibodeaux v. Executive Jet International, Inc., 328 F.3d 742 (5th Cir. 2003). The decision in Thibodeaux stands for the proposition that the question of whether or not a particular air service provider is one that is exempt from the FLSA is one which hinges upon a detailed factual inquiry.

All of the exhibits which defendants provide in their second renewed motion to dismiss were procured around the time or after the initiation of this lawsuit. For example, the website provided as an exhibit was visited almost a year after this litigation was initiated. See Defendants' Exhibit B. Additionally, Exhibit C provides a "Corporate Shuttle pamphlet and Charter Fleet information" which is dated Fall 2003 which was subsequent to the time the plaintiffs were employed by the defendant company and this litigation was initiated after the time the plaintiffs were by defendant FSG. See Defendants' Exhibit C. Exhibit D, while dated during the time when the plaintiffs were employed at the defendants' company, implies that its service is only for companies. See Defendants' Exhibit D. It is also unclear that this truly was an "advertisement" placed in the Wall Street Journal as such distinction is written in with pen at the bottom of said exhibit. Id.

Additionally, an article in "Aircraft and Aerospace," written in September of 2002 by one of the magazine's staff reports, states in the subtitle of said article, that defendant FSG is "Switzerland's very private airline on demand to royalty, or the very rich." See Defendants' Exhibit D. As stated previously, to hold itself out in an indiscriminate manner, FSG was required to initiate a public offering of the service. Stancil 253 N.C. at 302. The transcript of the radio advertisement on Bloomberg Radio, a public radio station, is irrelevant because it was allegedly broadcast well after the time the plaintiffs were employed by the defendant company and this litigation was initiated. See Defendants' Exhibit D. In Thibodeaux, that airline marketed its air transportation services on the internet, through direct mail, and at public events. 328 F.3d 742. In the instant case, during the time the plaintiffs were employed for the defendants, there is no evidence that the defendants advertised on the internet, through direct mail, or at public events.

Furthermore, it can hardly be stated, although defendants allege, that FSG "marketed its air transportation services through a wide range of public media outlets" when it is clear that during the time plaintiffs were employed there, the marketing and advertisement was discriminate in that it marketed to a certain type of travel within a certain type of market. See Defendants Second Amended Motion to Dismiss at 5; See Defendants' Exhibits C & D. The case law which defendants cite is miscited and its holding inapplicable here as the Board in Rocky Mountain Holdings decided that air transportation used for the specific of emergency airlift and air-ambulance service held itself indiscriminately, despite the fact only a portion of the public would need such emergency services. See Defendants Second Amended Motion to Dismiss at 5. It is

14

notable that in the instant case, FSG is alleging that it held itself out for public hire, while in <u>Rocky Mountain Holdings</u>, there was a holding out in case of a public emergency. Certainly, a medical airlift service should not be required to advertise and market their services as the airline was required to do in <u>Thibodeaux</u> and as the defendants were required to do here.

Defendants' assertion that FSG is subject to the RLA because it holds itself as a common carrier by air is a fiction created only to defeat the instant claims. There exists a general issue of material fact in that FSG has never subjected itself to the provisions of Title II of the RLA, as it now conveniently claims.[3] Cf.<u>Thibodeaux v. Executive Jet International, Inc</u>., 328 F.3d 742 (5th Cir. 2003).

**1) PrivatAir Group did not operate as a single entity but even if it did, it is irrelevant to the question of whether FSG is a common carrier by air.**

As set forth above, FSG did not operate as a common carrier by air nor did it operate as a single entity. Contrary to the contentions of the Defendants, the Organizational Chart of FSG does not demonstrate that the various corporations operated as a single entity. <u>See</u> <u>Defendants' Exhibit J</u>. Instead, the exhibit simply features a basic computer generated flow chart which supposedly links one corporation to the other. This exhibit does not contain any relevant corporate information nor indicate that the corporations are remotely linked to one another.

Furthermore, the primary question to consider here is whether or not the defendants fall under the RLA or the FLSA, not whether they operate as a single or joint entity. This is a genuine issue of material fact which cannot be decided on the instant

---

[3] It is worth noting that defendants have not moved for dismissal on the basis that the plaintiffs have failed to exhaust the administrative remedies that presumably they are afforded under the Railway Labor Act.

motion. In making their determination that the defendants fall under the RLA instead of the more appropriate FLSA, defendants erroneously rely on decisions of the National Mediation Board ("NMB"). The various NMB decisions cited by the defendants are not binding on this Court nor are they relevant if plaintiffs fall under the guidelines of the FLSA instead of the RLA.

The defendants provide alleged advertising efforts and management structures ofFSG Group in an effort to show that these various entities are operating as one corporation. See Exhibits B-E, F, K, L. However, in setting forth these arguments, the defendants are making the assumption that the plaintiffs fall under the RLA guidelines. This assumption is incorrect and leads to the need for legal and factual inquiry by this court.

Instead of falling under the RLA, plaintiffs contend that they clearly fall under the guidelines of the FLSA. This argument certainly compels an inquiry into the facts of this issue. Furthermore, since the plaintiffs may fall under the FLSA, it is immaterial to consider the NMB decisions and the distinction of whether or not FSG operates as a single entity or separate entities. The FLSA does not make a distinction between single entity and separate entities for eligibility except in certain circumstances where a joint employer will be equally responsible for compliance with the FLSA. See Zheng v. Liberty Apparel Co., No. 02-7826, 2003 U.S. App. LEXIS 26528 (2d Cir. Dec. 30, 2003). The FLSA simply defines the term "entity" as one that "suffers or permits" an individual to work within meaning of FLSA definition of "employ" if, as matter of economic reality, entity functions as individual's employer. Id, Fair Labor Standards Act of 1938, § 3(g), 29 U.S.C.A. § 203(g).

### 2) Whether FSG is a Common Carrier because it operates under an FAA Air Certificate and Authorization is a Genuine Question of Material Fact.

To provide public air transportation services, a common carrier by air must get a certificate from the FAA as the term is employed in the FLSA. <u>American Intern. Group, Inc. v. American Intern. Airways, Inc</u>., 726 F. Supp. 1470, 14 U.S.P.Q.2d (BNA) 1933 (E.D. Pa. 1989). However, contrary to the contentions of the defendants, possession of a certificate from the FAA does not necessarily mean that the air transportation service is a "common carrier by air". *See* Exhibit G, FAA Advisory Circular 120-12A.

Instead, the FAA issued guidelines for determining private carriage versus common carriage for personnel and interested segments of the industry. The guidelines specifically state that a carrier becomes a common carrier when it "holds itself out" to the public. <u>Id.</u> The FAA guidelines also include four elements in defining a common carrier by air; (1) a holding out of a willingness to (2) transport persons or property, (3) from place to place, and (4) for compensation. <u>Id.</u> Therefore, the defendants arguments, at best, compel that a legal and factual explanation as to the meaning of the term "common carrier by air" and its applicability to the issue here. Defendants cannot simply assume without a factual determination by this court that FSG is or is not a "common carrier by air." (add to paragraph re: request for plenary hearing re: juris. factual question?)

Moreover, defendants rely on their assumption that FSG automatically falls under the RLA. In formulating their argument, defendants cite a 1947 case from llinois to support their position that the airline was a common carrier by air because it held "an air certificate." <u>See</u> Second Amended Motion to Dismiss at 5, <u>see</u> <u>Roland v. United Airlines, Inc.</u>, 75 F. Supp. 25 (N.D. Ill. 1947)**.** This argument is flawed because <u>Roland</u> refers to

an air certificate held by the Civil Aeronautics Act which is not necessarily the same certificate or standards now used by the Federal Aviation Act which subsequently replaced it. The defendants' argument is further flawed because it fails to consider the factual inquiry which exists as to whether the plaintiffs in fact do fall under the RLA, and thereby assuming erroneously that holding an air certificate means that implicitly, an entity becomes a "common air carrier" by definition.

> **3) WhetherFSG operates as a Common Air Carrier because it provides Air Transportation Services in Interstate and Foreign Commerce is a Genuine Question of Material Fact.**

The defendants allege that by virtue of the defendants business in interstate commerce, they come within the definition of a common carrier by air under the RLA. However, this is not the legal test to qualify as a common carrier by air. As aforementioned, the FLSA and RLA are silent regarding what constitutes a "common carrier by air" or carrier by air." Title II of the RLA applies to "every common carrier by air engaged in interstate or foreign commerce." See Defendants' Second Renewed Motion to Dismiss at 3; 45 U.S.C. § 181 (2000). Case law cited by the defendants admit that engaging in interstate commerce is a second prong of a three tiered exemption test, for which the first prong considers if the employer is a common carrier by air. See Defendants' Second Renewed Motion to Dismiss at 3. Both the statutory construction of the RLA and the case law cited by the defendants separate the exception into three prongs, of which the definition of a common carrier by air carrier and engaging in interstate commerce at two separate prongs of the test. Therefore, the plaintiffs' statements that the defendant FSG engaged in interstate commerce, as well as the fact that the plaintiff-employees engaged in interstate commerce in their capacity as

employees for the defendant, has no relevance in regards to whether the defendant FSG was a common carrier by air.

## V.     CONCLUSION

Based on the foregoing, the plaintiffs respectfully request that this court deny the defendants' second renewed motion to dismiss the plaintiffs' complaint and allow the parties to present evidence to resolve the jurisdictional issue of whether the parties are exempt from the provisions of the FLSA.

                              Respectfully submitted,

                              THE PLAINTIFFS

BY: _____
      James T. Baldwin, Esq. (ct08535)
      COLES, BALDWIN & CRAFT, LLC.
      1261 Post Road, P.O. Box 577
      Fairfield, CT 06824
      Tel. (203) 319-0800
      Fax (203) 319-1210

## **CERTIFICATION**

This is to certify that a copy of this Memorandum of Law in Opposition to Defendants' Motion to Dismiss was sent by first class mail on November 18, 2005 to the following counsel of record:

Joseph C. Maya, Esq.
Russell J. Sweeting, Esq.
Maya & Associates, P.C.
183 Sherman Street
Fairfield, CT 06824

Richard J. Diviney, Esq.
65 Jesup Road
PO Box 390
Westport, CT 06881-0390

                              _____
                              James T. Baldwin, Esq.